Joseph **DOMINIC**, Plaintiff-Appellee, Cross-Appellant,

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.,** Defendant-Appellant, Cross-Appellee.

Nos. 739, 875, Dockets 86–7915, 86–7945.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1987.

Decided June 29, 1987.

Peter D. Isakoff, Washington, D.C. (Richard Ben-Veniste, Ben-Veniste & Shernoff, Washington, D.C., Martin Jacobson, New York City, of counsel), for plaintiff-appellee-cross-appellant.

Charles E. McTiernan, Jr., New York City, for defendant-appellant-cross-appellee.

Before NEWMAN, CARDAMONE, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

On June 17, 1983, plaintiff Joseph Dominic, then age forty-nine, was fired from his job with defendant Consolidated Edison Company of New York ("Con Edison"). Dominic brought this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* The jury rejected Dominic's claim that his discharge was the product of age discrimination but found that Con Edison had willfully fired Dominic in retaliation for his earlier complaints of age discrimination. Con Edison now appeals Judge Walker's denial of its motions for a directed verdict and for judgment notwithstanding the verdict or a new trial and from his final judgment awarding damages of $169,804.00, and attorneys' fees and costs in the amount of $121,076.25 and $7,919.44, respectively, 652 F.Supp. 815. Dominic cross-appeals, claiming that Judge Walker erred when he reduced the jury's award of front pay, refused to double the front-pay award as liquidated damages for Con Edison's willful violation and limited Dominic's attorneys' fees to the lodestar amount. We affirm.

## BACKGROUND

The primary claim on this appeal is the sufficiency of the evidence underlying the jury's finding of retaliatory discharge. We must of course view that evidence in the light most favorable to the plaintiff. *See, e.g., Konik v. Champlain Valley Physicians Hosp. Medical Center,* 733 F.2d 1007, 1013 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

Dominic's career in Con Edison's management began in 1971 when he became an instructor in an in-house training program. By 1976, he had risen to Training Director and was in charge of the Training Center for Con Edison's Power Generation Department. In that capacity, he oversaw seventy course offerings, managed the development of new courses and supervised between twenty and thirty employees, primarily instructors. During his rise to Training Director, and until early 1981, Dominic received substantial merit raises and excellent performance ratings.

In April 1981, Dominic was informed that, as a result of a company reorganization, the position of Training Director was to be merged into a new position called Manager of Training and Safety. Despite a promise by Dominic's supervisor, James Fry, that Dominic would be promoted to the new position, it was filled in May 1981 by John McNulty. McNulty was seven years older than Dominic, and his appointment as Manager of Training and Safety constituted a demotion from his former position as Plant Manager at Con Edison's East River power station. Simultaneously, Dominic was demoted to the newly created position of Management Training Coordinator and reduced in grade level from twelve

to eleven but with no decrease in pay. McNulty thereby became Dominic's superior. These changes were implemented by Daryl Wall, who had become Con Edison's Director of Services for the Power Generation Department in early 1981.

In January 1982, McNulty was apparently disgruntled over his demotion and left Con Edison. Dominic expressed interest in McNulty's former position but was again passed over, this time for Henry Howe. Dominic was forty-eight years old while Howe was thirty-five. Because Dominic possessed more experience than Howe and believed that he deserved the promotion, he called Fry to request a meeting. At the meeting with Fry and Wall on March 5, 1982, Dominic expressed his disappointment at Howe's selection and his belief that his statutory rights under the ADEA had been violated. Wall responded by criticizing Dominic's performance. Dominic then requested to be transferred from Wall's chain of authority, but Wall denied his request.

Management employees at Con Edison are periodically rated by their supervisors in "performance reviews." The employees receive an overall "performance appraisal" that can range from a high of "T," descending through "E," "S," and "F," to a low of "U." In January 1982, Dominic's supervisor, then McNulty, gave Dominic an "E" rating (performance consistently exceeds requirements). During the previous November, however, Fry and McNulty had discussed Dominic's rating. At that time, McNulty had proposed an "E" rating, but Fry believed that only an "S" (performance fully satisfactory and exceeds requirements in some areas) was deserved. Over McNulty's disagreement, an "S" rating was authorized on the company's official December 1981 salary sheets. In March 1982, after the March 5 meeting, Fry learned for the first time that McNulty had rated Dominic an "E" on the performance review instead of the authorized "S" as listed on the salary sheet. Fry then changed Dominic's performance review rating to an "S." Fry also raised the rating that Howe, who had been promoted over Dominic, had received from McNulty in November 1981 from an "S" to an "E." These retroactive changes departed from Con Edison's usual procedures.

Dominic was not informed that his rating had been altered. He discovered the alter-

ation only when his performance reviews were provided to him in late May pursuant to a request that he had made at the March 5 meeting. Dominic wrote to Wall on June 3, 1982, protesting the retroactive change in his rating and again objecting to what he perceived as age discrimination. Later in June, Dominic was transferred from the Training Center to Con Edison's corporate headquarters at Irving Place, where he came under Wall's direct personal supervision. The floor to which Dominic was assigned—the fourteenth floor—was occupied by fifty management employees of the Power Generation Department and was undergoing renovation when Dominic arrived. Because of the renovation, Dominic was required to change his work location several times and to endure substandard working conditions. He was eventually assigned to a new modular office on that floor.

At Irving Place, Dominic was assigned certain relatively ministerial tasks, such as the preparation of training schedules, that had previously been performed by clerical personnel. Dominic also continued to be entrusted with most of his former managerial responsibilities. Wall became responsible for reviewing Dominic's performance after his transfer to Irving Place. On January 25, 1983, she gave Dominic a performance review of "F" (meets minimum requirements but clearly requires improvement). Her report recited nine specific deficiencies in Dominic's performance and discounted the difficult working conditions that Dominic had faced, commenting that "most of the people in the [Irving Place] office ha[d] gone through similar inconveniences." Wall's report directed Dominic to develop both a method of organizing his work to meet deadlines and a "very specific results required list." Finally, the report provided that Dominic would "be rerated in 90 days, based on the agreed upon results required." At a meeting on January 25, 1983, Dominic protested this negative review. Wall told Dominic that she considered him on the borderline between an "F" and a "U" (generally weak, does not meet minimum requirements) but was rating him an "F" in the hope that he would improve his performance.

Shortly thereafter, Dominic told Patricia Conroy, personnel supervisor for the Power Generation Department and Wall's assistant, that he planned to file formal age

discrimination charges. On March 17, 1983, he did in fact file a complaint with the New York State Division of Human Rights. The next day, fifty-two rather than the specified ninety days after the January 25 meeting, Wall confronted Dominic with a new performance review. This review concluded that Dominic had "made no progress in developing a plan or schedule for any of his projects" and had "not responded to the requests for improvement defined in the January Performance Review." He was given a "U" rating, the lowest possible, and placed on formal ninety-day notice that his performance was unacceptable. Dominic apparently had developed a "results required list" and attempted to present it to Wall prior to March 18, but Wall had cancelled several appointments with him. As a result, Dominic had failed to fulfill the "agreed upon" component required by the January 25 performance review.

A review of Dominic's progress in meeting "results required" for the period after the March 18 meeting reveals that he was assigned more than twenty tasks. On June 17, 1983, ninety days after the March 18 review, Wall concluded that Dominic had not met his requirements in most areas and accordingly terminated his employment with Con Edison. Dominic filed an appeal with Wall pursuant to company guidelines on June 23 but received no response. Wall claimed never to have received his appeal. There was testimony, however, that Conroy forwarded it to her.

## PROCEEDINGS BELOW

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission, Dominic filed his complaint in the district court on October 27, 1983, claiming several violations of the ADEA. Two claims were submitted to the jury: first, that Dominic was discharged on June 17 because of his age, in violation of 29 U.S.C. § 623(a)(1), and, second, that he was discharged because of his allegations of age discrimination, in violation of 29 U.S.C. § 623(d). The jury found that Con Edison had not discriminated against Dominic because of his age but had willfully retaliated against him because of his complaints of age discrimination. The jury concluded

that Dominic was entitled to recover $67,902 in back pay and $378,000 in front pay.

Con Edison moved for judgment notwithstanding the verdict or for a new trial, claiming that the verdict of willful retaliation was unsupported by the evidence. Con Edison also argued that the decision whether to award front pay and the amount of such pay were equitable matters to be decided by the court, not the jury. Finally, Con Edison opposed Dominic's application for attorneys' fees. Judge Walker denied Con Edison's motion for judgment notwithstanding the verdict. He acknowledged that the jury could have believed Con Edison's version of the events, *i.e.*, Wall's legitimate dissatisfaction with Dominic's performance, but concluded that sufficient evidence supported Dominic's account as well. He concluded that the jury was entitled to infer a retaliatory motive from: (i) the retroactive lowering of Dominic's performance rating after his first complaints; (ii) evidence that Wall had deliberately deluged him with assignments to cause him to fail; (iii) the early performance reappraisal in March 1983 that cut short the time Dominic had to complete his required work; and (iv) his transfer to difficult working conditions at Irving Place. Moreover, Judge Walker concluded, evidence of Con Edison's purposefully retaliatory behavior coupled with its awareness of Dominic's age discrimination complaints was sufficient to justify a verdict of willful retaliation.

On the issue of front pay, Judge Walker held that "the court rather than the jury should evaluate equitable factors to determine not only whether front pay is warranted but also the amount to be awarded." He found that Dominic was well educated and that $34,000, rather than $378,000, was sufficient front pay to compensate him for the time it would reasonably take him to find comparable employment. He further held that the front pay award, as an equitable substitute for reinstatement, was not subject to the ADEA's liquidated damages provision. He did, however, double the jury's back-pay award as liquidated damages.

Finally, Judge Walker awarded Dominic attorneys' fees equivalent to the lodestar amount, reduced only by the fees incurred for EEOC proceedings. He refused to decrease the lodestar figure for time spent on

Dominic's unsuccessful claims because he found that those claims were inextricably intertwined with the successful retaliatory discharge claim. Nevertheless, he declined to double the lodestar amount to compensate Dominic's attorneys for the risks they faced, noting that the lodestar amount was far greater than the attorneys would have received had they been limited to a previously agreed-upon percentage of Dominic's recovery.

Accordingly, Judge Walker entered judgment in the amount of $169,804.00 in damages and $128,995.69 in fees and costs. This appeal and cross-appeal followed.

## DISCUSSION

### 1. *Sufficiency of the Evidence*

Con Edison argues that there is insufficient evidence as a matter of law to support the jury's finding that Dominic was discharged in retaliation for his complaints of age discrimination and that the retaliation was willful.

### (a) *Retaliation*

■ Dominic's case in chief established a prima facie showing of retaliatory discharge. Con Edison was aware of his complaints of age discrimination, which were soon followed by adverse actions such as his poor evaluations and subsequent discharge. *See Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986). The burden of going forward with evidence of legitimate reasons for the discharge shifted to Con Edison. This burden was carried by the considerable evidence of Dominic's poor performance. Dominic thus bore the ultimate burden of persuading the jury that " 'a retaliatory motive play[ed] a part in the adverse employment actions.' " *Id.* (quoting *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980)).

The question before us, therefore, is whether a reasonable jury could have found that Con Edison discharged Dominic because of his complaints of age discrimination. Although this was a very close case that we might well have decided differently were we the trier of fact, we conclude that there was sufficient evidence to allow the jury to adopt Dominic's version of the events.

Judge Walker relied on four incidents as a sufficient evidentiary basis for the jury's finding of a retaliatory motive. The first was Fry's retroactive alteration of Dominic's and Howe's performance ratings. Con Edison argues that this action cannot have been retaliatory because Fry had told McNulty as early as December 1981, well before Dominic's complaints of age discrimination, that Dominic could not be given an "E" rating. Indeed, the December 15 salary sheets confirm that Dominic was supposed to receive an "S." Even if no inference of retaliation can flow from Fry's subsequent correction of McNulty's apparent error, however, Con Edison has offered no similar explanation for the retroactive alteration of Howe's performance rating. This action, therefore, supports the inference that Con Edison deliberately made Dominic look inferior to his competitor in retaliation for his accusations of age discrimination.

Second, Dominic's transfer to Irving Place, which occurred after he attributed the change in his performance rating to age discrimination, and his working conditions at Irving Place support a finding of a retaliatory motive on the part of Wall. However, Con Edison notes that Dominic himself asked to be transferred from the Training Center. It also argues that reassignment to Irving Place was logical because fifty other management employees of the Power Generation Department were located there. In addition, the Management Training & Development Department, with which Dominic was to cooperate, was located nearby. Con Edison concedes that the working conditions on the fourteenth floor of Irving Place were difficult at that time but notes that all the employees located there shared similar conditions. Moreover, according to Con Edison, Dominic lost his private office at the Training Center when he was demoted in 1981, before he filed his age discrimination complaints. On the other hand, Dominic did seek a transfer, but only to get away from Wall. Moreover, he testified that he had retained his office at the Training Center until his transfer and that the other employees who suffered the adverse conditions at Irving Place were of significantly lower grade levels than he.

It is not our province to resolve these conflicting factual claims. The jury was

free to credit Dominic's version of events. It could thus conclude that Wall had retaliated for his complaints by bringing him within her direct and heavy-handed supervision and then subjecting him to unreasonable working conditions.

Third, the jury could have found from the pattern of Dominic's assignments at Irving Place that Wall had deluged him with work that was impossible to complete and was designed to cause him to fail. Dominic testified that many of these assignments consisted largely of time-consuming clerical work that had previously been done for him, not by him, when he was Training Director. An increase in clerical responsibilities can legitimately be explained by Dominic's demotion in 1982. However, there was also evidence that Dominic was given numerous assignments that might appropriately have been assigned to Wall's clerical staff. The jury could thus have concluded that these projects were intended to interfere with his attempts to reach other designated performance goals. This conclusion is supported by the testimony that Dominic was unable to obtain Wall's agreement upon a results required list because she failed to keep appointments made for that purpose. Furthermore, there was evidence that Wall's work assignments subjected Dominic to inconsistent and changing demands. For example, the jury could have found that Wall instructed Dominic to work with various committees to clarify goals for 1983–84 and develop ideas, but later excoriated him for having attended the committee meetings.

Finally, in Dominic's January 25 performance review, Wall gave him an "F" rating, indicated various areas in which he should improve, and told him that he "will be rerated in ninety days, based on the agreed upon results required." On March 17, 1983, Dominic filed a complaint with the New York Division of Human Rights. The next day, March 18, Wall gave Dominic a new performance review in which he received a "U" rating. He was then placed on formal ninety-day notice that his performance was unacceptable. Con Edison argues that there was no evidence that Wall was aware of the complaint when she prepared the March 18 review. Dominic testified that he had told Wall's assistant Conroy of his intention to file a complaint,

however, and the jury could have inferred that word of this intention reached Wall. Thus, Wall's decision to rerate Dominic after fifty-two days, instead of the proposed ninety, on the day after he filed formal age discrimination charges, supports the inference that Wall was retaliating for those charges.

■ There was thus evidence to support the jury's conclusion that Dominic's discharge was for purposes of retaliation. Con Edison argues in response that such a conclusion is legally impermissible in light of evidence that it was dissatisfied with Dominic's performance prior to his age discrimination complaints. We disagree. An employer or supervisor already dissatisfied with an employee's work performance may well react very negatively to a claim of discrimination and become even more inclined to discharge the employee. Moreover, claims of discrimination usually follow adverse actions by an employer, who will justify them as based on poor performance by the employee. Evidence of prior dissatisfaction is thus present in virtually every case in which a claim of retaliation is made. The ADEA's prohibition of retaliation would thus be meaningless if such evidence precluded a jury from finding retaliation. We note, moreover, that in the instant case the evidentiary effect of Wall's prior expressions of dissatisfaction was undermined by evidence that her dissatisfaction increased after March 1982.

Con Edison also argues that Dominic's performance was in fact unsatisfactory and justified the actions taken by Wall. For example, during 1982 and 1983, while he was a full-time management employee at Con Edison, Dominic attended law school at night and spent more than thirty-six hours per week pursuing a law degree. However, the existence of a foundation for Wall's dissatisfaction with Dominic's performance does not exclude a retaliatory motive as the cause of Dominic's discharge.

Finally, Con Edison attacks the verdict on the ground that Dominic offered no affirmative evidence that his performance was satisfactory after March 1982. However, the jury's verdict was not based solely upon a disbelief of Wall's testimony and upon a resultant inference that the opposite must be true. *See Martin v. Citibank, N.A.,* 762 F.2d 212, 217–18 (2d Cir.1985).

Independent evidence of a retaliatory motive exists in the retroactive change in Howe's performance rating, the transfer to Irving Place, the imposition of time-consuming clerical work and Wall's shifting demands and rating periods. Because we cannot "find that no reasonable fact-finder could have reached a verdict for the plaintiff," *id.* at 217, we must affirm the jury's finding of liability and Judge Walker's denial of judgment n.o.v.

### (b) *Finding of Willfulness*

Judge Walker doubled the jury's back-pay award because the jury found that Con Edison's retaliation against Dominic was "willful." *See* 29 U.S.C. § 626(b). Con Edison argues that there is insufficient evidence to support the finding of willfulness. The Supreme Court has held that a violation of the ADEA is willful if " 'the employer ... knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) (quoting *Air Line Pilots Ass'n Int'l v. Trans World Airlines, Inc.,* 713 F.2d 940, 956 (2d Cir.1983), *rev'd in part on other grounds,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). In *Thurston,* the Court explicitly rejected a standard that would have required a finding of willfulness whenever an employer knew that the ADEA was "in the picture." The Court concluded that "Congress intended a two-tiered liability scheme" rather than one that would result in an award of double damages "in almost every case." 469 U.S. at 127–28, 105 S.Ct. at 625.

Con Edison contends that there is no evidence that it was aware that the ADEA prohibits retaliation for complaints of age discrimination. If willfulness is found in such circumstances, Con Edison argues, every finding of intentional retaliation will automatically carry with it a finding of willfulness, contrary to the teaching of *Thurston.* We disagree.

■ Given that the jury found that Con Edison retaliated against Dominic for his age discrimination complaints and that those complaints specifically referred to his statutory rights under the ADEA, we conclude that the jury could reasonably have found that Con Edison showed reckless disregard as to whether retaliatory conduct was prohibited by the ADEA. In reaching this conclusion, we agree with *Powell v. Rockwell Int'l Corp.,* 788 F.2d 279 (5th Cir.1986), which held that even if an employer "did not 'know' that firing an employee in retaliation for filing an ADEA claim was illegal, then that action was certainly 'reckless.' " *Id.* at 286; *see also Rose v. Hearst Magazines Div.,* 814 F.2d 491, 493 (7th Cir.1987) (where employee filed ADEA claim, jury finding of retaliation is irreconcilable with finding that violation was "nonwillful"). We therefore hold that where an employee is discharged or demoted because of opposition to a practice made unlawful by Section 4(d) of the ADEA, *see* 29 U.S.C. § 623(d), and where that opposition includes a specific claim that his or her statutory rights under the ADEA are being violated, a trier of fact can find willfulness as defined by *Thurston.*

■ This conclusion is consistent with a two-tiered liability scheme and will not cause every finding of intentional retaliation to lead automatically to a finding of willfulness. For example, where an employee has "opposed any practice made unlawful by" the ADEA, 29 U.S.C. § 623(d), by expressing general disagreement with the practice, without referring to statutory rights under the ADEA, a finding of intentional retaliation alone might not always be sufficient to support a finding of willfulness. We need not of course define the universe of conduct that will or will not support such a finding. We hold only that a trier of fact may conclude that an employer has shown reckless disregard for the illegality of his conduct, and has thereby acted willfully under *Thurston,* when an employee's complaints put the employer specifically on notice that it might be violating the ADEA and it intentionally retaliates for those complaints. Under such circumstances, the ADEA is no longer merely "in the picture," *Thurston,* 469 U.S. at 127, 105 S.Ct. at 625. The award of liquidated damages must therefore be affirmed.

### 2. *Reduction of Front-Pay Award*

In *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir.1984), we held

that a monetary award of front pay is sometimes necessary as " 'equitable relief ... appropriate to effectuate the purposes of [the ADEA]' " (quoting 29 U.S.C. § 626(b)), particularly where the employment relationship has been irreparably damaged by the animosity flowing from litigation. In such cases, of course, the decision whether to award front pay in lieu of reinstatement is an equitable one entrusted to the trial judge.

■ Dominic nevertheless argues that once the trial judge has found an award of front pay to be appropriate, the amount reasonably necessary to compensate the plaintiff is a factual issue that must be submitted to the jury under the ADEA. We disagree. Our analysis of the language and structure of Section 626 indicates that Congress intended to limit jury trials to factual issues underlying claims for legal relief. Section 626(b) provides that violations of the ADEA may be remedied by two kinds of relief. The first, "[a]mounts owing ... as a result of a violation," includes unpaid wages as well as liquidated damages for willful violations. The second is "such legal and equitable relief as may be appropriate," including reinstatement. Finally, the jury trial provision, Section 626(c)(2), provides for a trial by jury only "of any issue of fact in any such action for recovery *of amounts owing* as a result of a violation" (emphasis added).

This language is subject to conflicting interpretations. One interpretation is that facts relevant to a plaintiff's legal recovery, namely recovery of "amounts owing," are to be tried by a jury even if equitable relief is also sought, but that issues concerning equitable relief are not to be tried by a jury. Another interpretation is that whenever some legal relief is sought, all factual issues in the action are to be tried by a jury.

The legislative history of Section 626(c)(2) supports the former interpretation. The House Conference Report identified the components of "amounts owing" as "items of pecuniary loss such as wages, firing, and other job-related benefits" and liquidated damages. Providing a jury trial in ADEA actions for lost wages was uncontroversial in light of the then-recent Supreme Court decision in *Lorillard v. Pons,*

434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), which held that such relief under the ADEA was "legal." However, *Lorillard* did not decide whether liquidated damages were legal or equitable in nature and thus did not determine whether the seventh amendment provided a right to a jury trial on such claims. The Conference Report concluded, however, that "[b]ecause liquidated damages are in the nature of legal relief, it is manifest that a party is entitled to have the factual issues underlying such a claim decided by the jury." H.R. Conf. Rep. No. 950, 95th Cong., 2d Sess. 13–14, *reprinted in* 1978 U.S.Code Cong. & Admin.News 504, 528, 535. Congress thus intended to provide a right to a jury trial on all claims that it considered to be "legal" in nature, including claims for liquidated damages. Congress effectuated that intent by providing for a jury trial in actions for recovery of "amounts owing." The inference to be drawn from this legislative history is that Congress' intention was simply to comply with the seventh amendment by providing for a jury trial of factual issues underlying such claims. There is no evidence that Congress intended to depart from the traditional distinction between legal and equitable claims embodied in the seventh amendment.

We believe this is a common sense result. There is much overlap between the facts relevant to whether an award of front pay is appropriate and those relevant to the size of the award. For example, both questions turn in part on the ease with which the employee will be able to find other employment. To divide the fact-finding responsibilities in such circumstances would be anomalous and would risk inconsistent decisions. A jury might conclude that the employee would never find other work and award a large sum in front pay, while the judge found that he or she would find work immediately and that no award was appropriate. Or, a judge might find front pay appropriate, but the jury might award only a nominal sum based on its belief that the employee could secure immediate employment.

Our decision is consistent with Congress' provision for a jury trial on the issue of future lost earnings in cases under the Jones Act and Federal Employers' Liability Act. Defendants may be held liable under

those statutes for personal injuries caused by negligence, and plaintiffs' claims for lost future wages are legal in nature. In the present case, on the other hand, front pay is a matter for the exercise of the trial judge's equitable discretion.[1] *But see Maxfield v. Sinclair Int'l*, 766 F.2d 788, 796 (3d Cir.1985) (amount of front pay award is for jury).

Dominic also argues that even if it were within Judge Walker's discretion to reduce the jury's front-pay award, his $34,000 award was clearly too low. That award was based on Judge Walker's conclusions that Dominic's loss was $17,000 per year, the "approximate difference" between the salary he was earning at Con Edison when discharged and the salary he is paid at his present job and that two years was a "reasonable allotment of time in which [Dominic] can be expected to find employment comparable to that which he lost at ConEd." Dominic argues that the court's conclusion that he could easily find comparable employment "was most unrealistic" and erroneously placed on him the burden of proving that he had mitigated damages. Moreover, Dominic contends that uncontradicted testimony at trial established that had he been allowed to stay at Con Edison, his salary by the time of trial would have been $14,000 higher than it was at the time of discharge, and thus that Judge Walker's award was at least $28,000 ($14,000 × 2 years) too low.

■ We are not persuaded by these arguments. First, Dominic's position misunderstands the role of the mitigation-of-damages issue. Had Con Edison proved that Dominic failed to mitigate damages— for example, by refusing a substantially equivalent job—Dominic's back-pay award would have been cut off or reduced at the time of his failure to mitigate and any front-pay award would have been foreclosed. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 233–34, 102 S.Ct. 3057, 3066–67, 73 L.Ed.2d 721 (1982). However, Con Edison's failure to show that Dominic had not

mitigated damages does not entitle him to a lifetime front-pay award. In calculating the size of a front-pay award the court must estimate the plaintiff's ability to mitigate damages in the future. Such a determination is committed to that court's discretion. Dominic offers no basis from which we can conclude that Judge Walker abused his discretion in finding that two years was a reasonable amount of time for Dominic to find comparable employment.

■ Second, we also find no reason to disturb Judge Walker's exercise of equitable discretion in awarding Dominic $17,000 for each of the two years of the front-pay period. Con Edison was dissatisfied with Dominic's performance, as evidenced by the jury's finding that he was not the victim of age discrimination. In light of Con Edison's negative opinion of Dominic, Judge Walker was not required to find that Dominic would have received steady pay raises had he not been discharged or even that he would not have suffered another demotion. An award of front pay equivalent to the difference between Dominic's salary at the time of discharge and his salary at time of trial was thus within Judge Walker's discretion.

■ Finally, Dominic claims that the award of front pay should be doubled because Con Edison's violation was willful. Again, we disagree. Section 626(b) provides that "[a]mounts owing ... as a result of a violation of" the ADEA be treated in the same manner as unpaid minimum wages and overtime compensation under Section 216(b) of the Fair Labor Standards Act ("FLSA"). The FLSA in turn provides for a mandatory award of liquidated damages for those amounts. *See* 29 U.S.C. § 216(b). However, the remedial provisions of the ADEA and the FLSA "are not identical," *Thurston*, 469 U.S. 111, 125, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985). The ADEA thus expressly limits the award of liquidated damages to cases of "willful violations." Most importantly, as our previ-

---

1. Con Edison argues that Dominic has waived his claim to both reinstatement and front pay by not genuinely seeking reinstatement to his former position. Con Edison concedes, however, that Dominic has sought reinstatement to his previous position as head of the Training Center. Even though Dominic may not have been seriously interested in the particular job from

which he was fired because he remained unhappy about an earlier demotion, his efforts to regain that earlier job prevent us from concluding that reinstatement was not genuinely pursued. In any event, it was within Judge Walker's discretion to award front pay and to take into account Dominic's lack of serious desire for his prior job in setting the amount.

ous discussion indicates, front pay is not within the meaning of "amounts owing" in Section 626(b). Accordingly, a discharged employee has no entitlement to liquidated damages equal to his front-pay award.

### 3. Counsel Fee Award

Con Edison argues that Judge Walker erred in not limiting the award of counsel fees to the amount his counsel would have received under the contingent fee agreement and not reducing the lodestar amount by the value of legal services expended on Dominic's unsuccessful claims. Dominic argues that Judge Walker erred in refusing to increase the counsel fee award beyond the lodestar amount to compensate for the risk faced by his counsel.

### (a) Contingent Fee Agreement

██ Judge Walker's award of counsel fees exceeded the amount Dominic's counsel would have received under the contingent fee agreement they had with Dominic. In the context of fee awards in a civil rights case under 42 U.S.C. § 1988, we have upheld an award in excess of an agreed-upon contingent fee. *See Wheatley v. Ford,* 679 F.2d 1037, 1041 (2d Cir.1982). Although we did not explicitly articulate a rationale for this conclusion, we relied upon *Buxton v. Patel,* 595 F.2d 1182, 1185 n. 3 (9th Cir.1979), which noted that "[i]t would be anomalous for courts to discourage contingent fee arrangements by allowing the recovery of fees when such arrangements are absent and denying recovery when they are present." *Id.* We endorse this rationale and believe it applicable to fee awards under the ADEA.

Con Edison argues that *Wheatley* is inapplicable because the civil rights cases governed by Section 1988 generally result in smaller damage awards than employment discrimination actions. The former are thus less likely to induce attorneys to handle such cases on a contingent basis. From that not indisputable factual premise, they conclude that *Wheatley* is inapposite. We disagree. First, Congress has in no way indicated that the policies underlying Section 216(b) differ from those underlying

Section 1988. Each simply provides for an award of a "reasonable attorney's fee." Second, the question addressed in *Wheatley,* whether to enforce a contingent agreement as an upper limit on a fee award, cannot arise until a contingent fee agreement has already been entered into a civil rights case. At that point, the attorneys have already determined that the case is sufficiently attractive for them to offer representation on a contingent basis. Civil rights cases subject to the rule in *Wheatley* are not likely to differ significantly from ADEA cases in their potential recoveries. We are therefore bound by *Wheatley* to uphold Judge Walker's decision.

### (b) Adjustments to Lodestar Amount

Both parties argue that Judge Walker erred by awarding an amount of fees roughly equivalent to the lodestar amount, i.e., the number of hours reasonably expended multiplied by a reasonable hourly rate. They do not agree, however, on the manner in which he supposedly erred.

██ Con Edison argues that Judge Walker should have excluded from the lodestar amount fees for time spent on Dominic's unsuccessful claims, such as his claim that he was the victim of age discrimination. It is clear that "[w]here ... claims are separable, and one or more are found to be without merit, then the district court should decline to award that portion of the requested fees which relate to the unsuccessful claim." *McCann v. Coughlin,* 698 F.2d 112, 130 (2d Cir.1983) (footnote omitted). On the other hand, when a plaintiff's claims for relief "involve a common core of facts or [are] based on related legal theories," the "lawsuit cannot be viewed as a series of discrete claims." *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). Rather, the district court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* Judge Walker concluded that the factual and legal theories underlying Dominic's age discrimination claim were inextricably intertwined with those underlying his retaliatory discharge claim. Consequently, a fully compensatory fee award was justified because Dominic recovered the same relief on the

retaliation claim that he would have on his discrimination claim.

We agree. The basic issues at trial were substantially intertwined. Thus, the facts that underlie Dominic's claim of age discrimination, e.g., his demotion, were used by Con Edison to show its prior dissatisfaction with his work performance in rebutting the retaliation claim. Moreover, although the merits of Dominic's retaliation claim did not depend on the validity of his complaints of age discrimination, *see Davis*, 802 F.2d at 642, there is authority that Dominic could recover on his retaliation claim only if his complaints of age discrimination had a reasonable foundation. *See Wolf v. J.I. Case Co.*, 617 F.Supp. 858, 868 (E.D.Wisc.1985). Judge Walker acted well within his discretion in awarding a fully compensatory fee.

Dominic contends that the fee award should be remanded for upward adjustment in light of *Lewis v. Coughlin*, 801 F.2d 570 (2d Cir.1986). In *Lewis*, we held that "[a]lthough the risk of losing will not alone justify a bonus, a significant risk of not prevailing coupled with a contingent fee arrangement may be sufficient to merit [an] upward adjustment" in the lodestar amount. *Id.* at 576. We therefore reversed the district court's fifty percent upward adjustment and remanded for findings of fact on the existence of a contingent fee arrangement and the probability of failure. Dominic asks us to remand this case for similar findings.

In *Lewis*, however, the district court awarded a bonus without making explicit findings. In contrast, Judge Walker considered Dominic's claim that his counsel faced great risk before he declined to award the requested 100 percent bonus. The twelve factors that should be considered in fixing a fee award were set forth prior to *Lewis* in *City of Riverside v. Rivera*, —— U.S. ——, 106 S.Ct. 2686, 2691 & n. 3, 91 L.Ed.2d 466 (1986), and Dominic

does not claim that Judge Walker failed to apply these standards in setting his award. As *Lewis* recognized, "[c]ontingency is but one of twelve." 801 F.2d at 575. Judge Walker also expressly considered counsel's agreement to represent Dominic on a contingency basis, a consideration that *Lewis* held "is a strong factor militating against a bonus award as the percentage arrangement in any such agreement takes into account the possibility of losing the case." 801 F.2d at 576. Accordingly, Judge Walker's decision not to double the lodestar amount was not an abuse of his discretion.

### CONCLUSION

Because we find no error in any of Judge Walker's rulings, we affirm.

## ON PETITION FOR REHEARING

In its petition for rehearing, appellant contends that our statement that "Dominic ... bore the ultimate burden of persuading the jury that 'a retaliatory motive play[ed] a part in the adverse employment actions,'" at 1254 (quoting *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986)), erroneously weakened the applicable test of "but for" causation, which was properly charged to the jury in the instant case. We disagree. "A retaliatory motive 'plays a part' in an adverse employment decision only when it is causally connected to the adverse action or, in the language of *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976)], when it is the 'but for' cause of the adverse action." *Davis*, 802 F.2d at 645 (Newman, J., concurring).

The petition for rehearing is accordingly denied.